Filed 7/31/23  In re S.P. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | B317999<br>(Los Angeles County<br> Super. Ct. Nos.<br> 18CCJP01623,<br> 18CCJP01623A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>J.P.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tempore. Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

---

Mother J.P. appeals from the juvenile court's order denying her petition under Welfare and Institutions Code section 388,[1] in which she sought reinstatement of reunification services with her daughter, S. Mother argues that the trial court abused its discretion in denying her section 388 petition, based on its findings that she failed to show changed circumstances and that reinstating her reunification services was not in the child's best interests. We find no error in the trial court's order and therefore affirm.

## BACKGROUND

### I. *Referral and Petition*

S. was born in August 2017 to mother and father, R.L.[2] The family first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when mother and S. tested positive for marijuana and amphetamines at the time of S.'s birth. Mother admitting using methamphetamine for several years, but stated that she had stopped a month and a half earlier, when she found out she was

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father is not a party to this appeal. We provide details as to father only as helpful for background.

2

pregnant.  DCFS closed the referral alleging neglect as inconclusive.  DCFS received two more referrals in September and October 2017 alleging that mother was using drugs, driving recklessly with S. in the car, and physically fighting with maternal aunt.

DCFS received the referral initiating the instant case on January 25, 2018.  The caller reported that mother had moved in with maternal grandmother (MGM) after S. was born.  MGM suspected that mother and father were using drugs in mother's room.  When questioned about it, mother tried to hit maternal aunt while mother was holding S.  Mother then "took off running" with S.  Mother moved out of MGM's home shortly thereafter and began staying with a friend.

The reporting party also stated that mother had placed S. in danger in the past, including driving drunk with S. on her lap and hitting father when he said he was worried about S.  The reporting party additionally told DCFS that mother had "crazy tantrums," "extreme mood swings," and became "violent out of nowhere."  The caller expressed concern that under mother's care, S. was not getting enough food or sleep.

A DCFS children's social worker (CSW) visited the home of mother's friend S.W. the same day.  Mother and S. were not present.  S.W. stated that mother and S. had been staying with her for several months.  In mother's bedroom, the CSW observed a pocketknife on a table and a kitchen knife on the floor, both of which would be accessible to a child.  The CSW also observed a small bag containing a white substance.

Another CSW visited the home the following day, January 26, 2018, and spoke with mother.  Mother appeared to be sober

and there were no drugs or drug paraphernalia visible in the home.  Mother reported that she and father did not live together, but sometimes they met so that he could visit with S.  She denied any domestic violence, driving while intoxicated, or any use of drugs or alcohol.  The CSW observed that S. appeared to be in good health.

Mother tested positive for cannabinoids on January 31, 2018.  Due to the allegations of physical abuse, S. received a medical evaluation on February 2, 2018.  The results were normal.  Mother told the doctor that she had not received any prenatal care because she was not aware she was pregnant until about six and a half months into the pregnancy.  Mother also admitted using marijuana and methamphetamine during the pregnancy.  Mother appeared at the examination with scratches on her face, which she said occurred when she got into an altercation with several strangers after someone cut her off while she was driving with S. in the car.  In the doctor's report, she stated that based on mother's "histories of police involvement and violent altercations, as well as mother's rapid and tangential patterns of speech, I am concerned about mother's mental health at this time."

In March 2018, DCFS detained S., placed her with MGM, and filed a dependency petition on behalf of S. under section 300, subdivision (b)(1).[3]  In count b-1, the petition alleged that mother

---

[3]      Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer,

4

had a history of abusing substances, including methamphetamine, amphetamine, and marijuana, and was a current abuser of methamphetamine and marijuana. The petition further alleged that mother abused these substances during her pregnancy and had been under the influence of marijuana while caring for S. The petition also alleged that father failed to protect S. because he knew or should have known of mother's substance abuse, but he allowed S. to live with mother. Count b-2 alleged that father had a history of substance abuse, including methamphetamine and marijuana, and that mother knew of this history but failed to protect S.

At the March 13, 2018 detention hearing, the court found a prima facie case for jurisdiction over S. under section 300. The court ordered S. to remain detained from mother and placed with MGM. The court ordered family reunification services for mother and monitored visitation three times per week.

## II. *Jurisdiction/Disposition Report*

In its April 2018 jurisdiction/disposition report, DCFS detailed an interview with MGM on April 13, 2018. She reported that in the past, mother drank alcohol all day, to the point of "near death." MGM stated that during the time mother and S. lived with her, mother was very aggressive and violent toward MGM. Mother and father would smoke and use drugs in mother's room.

MGM told DCFS that mother was visiting S. almost every day, and mother was attentive and caring toward S. However, on

---

serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

April 25, 2018, there was an incident during a visit. Mother found out that MGM was going to send S. to daycare when MGM returned to work. Mother started to scream and threatened to kill MGM. When maternal uncle tried to intervene, mother threw his glasses across the room. S. was crying during the incident. MGM told the CSW that she was scared of mother. As a result of this incident, DCFS modified mother's visits to take place in a neutral location with a third-party monitor.

Mother spoke with a dependency investigator in April 2018. She stated that she had not used methamphetamine after S.'s birth, but admitted using marijuana. She stated that she started using methamphetamine and marijuana when she was 16 years old and went to a rehabilitation center at age 18. Mother reported that she drank alcohol "here and there," but also that she would drink every day after work.

Mother's drug test results were positive for cannabinoids on January 31 and April 13. She failed to test as scheduled on the remaining four test dates in March and April 2018. Mother enrolled in an outpatient drug treatment program on May 17, 2018.

In a last-minute information filed June 11, 2018, DCFS reported that it had interviewed father. He stated that he was not aware of mother using alcohol or drugs and denied using drugs with mother. He had no concerns about mother when he saw her caring for S. His last contact with mother was in January 2018.

In a last-minute information filed July 20, 2018, DCFS provided a progress report from mother's treatment program. The report stated that mother continued to test positive for

substances, including marijuana, methamphetamine, amphetamine, and alcohol. Mother was struggling with managing her stress and anxiety related to the DCFS case and her relationship with her family. She agreed to a referral for mental health services.

## III. *Adjudication and disposition*

At the July 2018 adjudication hearing, the court amended the petition to allege in count b-1 that mother engaged in substance use, rather than abuse, and added alcohol to the list of substances. The court struck the allegation that mother was under the influence of marijuana while caring for S. The court also struck the allegations from count b-2 regarding mother's failure to protect regarding father's substance abuse. Mother pled no contest to the petition.

The court sustained the petition as amended, finding jurisdiction over S. under section 300, subdivision (b). The court ordered monitored visitation for mother and ordered DCFS to set up a written visitation schedule, with discretion to liberalize mother's visits upon verification of negative drug tests. The court continued the matter for disposition.

In a last-minute information filed August 8, 2018, DCFS reported that mother had agreed to comply with the case plan. However, mother did not appear for any of her scheduled drug tests in May or July 2018. In June, she failed to appear twice, tested positive once for cannabinoids, and had one negative test with a diluted specimen.

Mother's drug treatment program provided a letter dated August 6, confirming that mother was enrolled in substance use treatment, mental health services, and child development class.

7

The letter stated mother showed "limited compliance and limited progress." She had missed four of 21 sessions, and out of six urinalysis tests, three were positive for THC, methamphetamine, and amphetamine. Mother had not started mental health services due to insurance issues, and she struggled with participating in 12-step meetings. Her treatment team recommended residential treatment.

At the August 8, 2018 disposition hearing, the court found by clear and convincing evidence that removal was necessary. The court ordered family reunification services for mother, with her case plan including weekly substance testing, a full drug and alcohol rehabilitation program, a 12-step program, parenting class, mental health counseling and a psychiatric evaluation, individual counseling, and monitored visitation.

## IV. *Period of Review*

According to DCFS's January 15, 2019 status review report, S. was doing well with MGM. Mother continued to live with her friend, S.W., and attend the outpatient rehabilitation program. Mother had limited progress and attendance in the program in November 2018. She visited S. twice per week and visits were appropriate. Mother was allowed unmonitored visits with S. starting December 21, 2018 after having negative weekly drug tests for the past month. However, although mother had negative test results from Pacific Toxicology from November 7 to December 17, 2018, her weekly testing results from her treatment facility during the same period were consistently positive for substances. Mother also failed to appear for testing on December 27, 2018. DCFS therefore recommended that mother return to monitored visitation. Because mother was not

consistent in appearing for testing or maintaining sobriety, DCFS recommended terminating services and implementing a permanent plan for S.

In a last-minute information filed February 4, 2019, the counselor at mother's treatment program reported that mother's compliance during the program had been "partial . . . due to her inability to stop using drugs." In January, mother frequently missed sessions and tested positive for marijuana on January 7, 2019. Unless mother entered a residential treatment program by February 1, the program would close her case.

At the February 5, 2019 review hearing, the court found mother had made partial progress toward alleviating or mitigating the causes necessitating placement. The court continued mother's reunification services.

DCFS filed a status review report on April 17, 2019, reporting that mother had negative test results from January to March, 2019 which was her longest period without using drugs, but relapsed again in March. Mother continued to visit S. consistently. But after she tested positive for amphetamine and methamphetamine on March 7, 2019, her visits were returned to monitored.

Mother had stopped participating in the drug rehabilitation program and was arrested on March 26, 2019 for driving under the influence (DUI) of alcohol and drugs. Mother admitted the DUI incident and stated that it was "so stupid." She continued to submit to weekly drug testing and participate in individual therapy. Mother stated that she wanted to reunify with S. and would enroll in another outpatient program. DCFS assessed S.'s risk level if returned to mother as "very high" and again

recommended termination of services. Both MGM and maternal aunt were willing to provide a permanent home for S. if mother did not reunify with her.

In a last-minute information filed June 25, 2019, DCFS reported that mother had been in compliance with her weekly drug tests, with negative test results for the last three months. Mother had been attending an outpatient drug program since April 16, 2019, as well as weekly Narcotics Anonymous meetings, weekly therapy sessions, and she had been taking her medications as prescribed. Mother continued to regularly visit S. and visitation reports stated that S. appeared bonded to mother, looking to her for reassurance. DCFS recommended that the court continue mother's family reunification services for three months to allow DCFS to assess her compliance and progress.

At the June 27, 2019 review hearing, the court found mother in compliance with her case plan and continued reunification services. The court again gave DCFS discretion to liberalize mother's visitation to unmonitored.

DCFS reported in a September 5, 2019 status review report that mother continued to participate in an outpatient drug rehabilitation program, attend weekly therapy sessions, and take medication for "depressive symptoms." Mother was allowed unmonitored visits from July 5 to August 22, 2019 after consistently producing negative test results. However, the visits were returned to monitored status when DCFS received two "suspicious" urine test results in July and August, as well as two no-show results. Mother visited S. about six hours every week. She was unable to have visits in her home, due to safety concerns with others living there. DCFS recommended terminating

services for mother.

In a September 24, 2019 last-minute information, DCFS reported that mother's counselor at her treatment program could not provide any update because mother had not consented to the disclosure. Mother previously told the CSW that she was not testing as required by the program. The CSW also reported that mother had been inconsistent with the random drug tests. The CSW explained to mother that an invalid test would be considered suspicious, but mother had another test with an invalid result on August 10, 2019.

DCFS also reported that mother had limited communication with MGM. MGM stated that she wanted to be the permanent caretaker for S. because she could not trust mother, who had shown a pattern of sobriety followed by relapse since high school.

In a second last-minute information filed the same day, DCFS stated that mother was making "her best effort to comply with the court orders," and continued to attend the drug rehabilitation program. However, mother was arrested on August 29, 2019 for non-compliance with court orders related to her DUI and released on September 6. Further, mother was inconsistent in complying with drug testing. Mother failed to appear for testing on September 17.

At the September 25, 2019 review hearing, the court found that mother's progress had not been substantial and therefore terminated her reunification services. The court ordered DCFS to provide permanent placement services to S. and set the matter for a permanency planning hearing.

## V.   *Permanency Planning and Section 388 Petition*

DCFS filed a section 366.26 report in January 2020, reporting that S. continued to do well with MGM. She was healthy and developmentally on target, except for a speech delay for which she received weekly speech therapy. S. was happy, well-adjusted, and closely bonded to MGM. MGM indicated that due to her age, she preferred to pursue legal guardianship of S., with the hope that maternal aunt could adopt the child in the future. MGM stated she had strong support from maternal aunt and uncle in helping to raise S.

Mother continued to have monitored visits with S. at least twice per week, for three hours each visit, with no issues or concerns reported. However, DCFS reported that despite receiving extensive services from DCFS, including 18 months of reunification services, mother "remains limited in her ability to provide adequate, safe care and supervision for her child." DCFS recommended that the court appoint MGM as S.'s legal guardian and terminate jurisdiction.

On February 21, 2020, the court found by clear and convincing evidence that it would be detrimental to return S. to her parents' custody and that legal guardianship was in her best interests. The court ordered legal guardianship as the permanent plan, appointing MGM as the guardian. Mother was allowed continued monitored visitation for three hours, three times per week. The court terminated jurisdiction over S.

Over a year and a half later, on November 17, 2021, mother filed a section 388 petition (form JV-180). She requested that the court "reopen" the case and reinstate her reunification services for six months. She did not list any changed circumstances.

Regarding why the requested action would be better for S., mother stated that she was in her tenth month of a 12-month residential rehabilitation program and was a "new Christian woman." She explained that she had "done all this to become the best mother I can for my daughter. . . . I am willing to do anything to better myself to be the best role model/mother for S[.]"

In an attached letter, mother stated that since entering the "Christian-based" residential rehabilitation program in February 2021, she had been "able to heal inside and out from traumas of my past," and "gained a new positive perspective on life." She explained that in the program she had learned how to identify her triggers, developed coping skills, learned to apply conflict resolution methods in anger management classes, and conformed to the program's "structured daily schedule." Mother also detailed what she had learned in her parenting classes and stated that her goal was to raise S. in a safe, stable, and permanent home. Mother listed the dates of her visits with S. in 2021. She also provided a letter from her program, confirming that she had enrolled in February 2021 and was "successfully meeting all of the requirements for growth." Additionally, mother included several letters from volunteers in the program, attesting to mother's progress, as well as completion certificates for anger management and parenting courses.

The court set the section 388 petition for hearing and ordered DCFS to file a responding report. DCFS filed an interim review report on January 5, 2022. In a December 2021 meeting with the CSW at her residential rehabilitation program, mother stated that she planned to remain in the program until May

13

2022, and that her time had been extended beyond the 12 months due to a relapse in August 2021. Mother explained that she had an overnight visit with MGM and S., and mother and MGM had a disagreement over what S. was going to wear to school, resulting in her relapse. Mother's program did not require drug testing and mother was not testing. The program also did not allow participation in 12-step meetings, although it had a similar program that met once a month.

On December 27, 2021, the CSW met with S. at home with MGM, noting that S. appeared well cared for and emotionally well adjusted. MGM stated that during the overnight visit with mother, mother did not want to leave her bedroom or engage with S. or the adults. MGM stated that mother's appearance reminded her of the times that mother was under the influence. Mother was not allowed to have visits at MGM's home after that incident. Mother continued to regularly have visits with S. at mother's residential program. MGM stated she did not think mother was ready to take care of S.

The CSW reported that mother had not completed her DUI program and a bench warrant had been issued for her arrest. DCFS concluded that mother was "on the correct path" in working on her sobriety and learning to cope with stressors, but she had not made the necessary changes for the court to grant the section 388 petition.

The court held a hearing regarding mother's section 388 petition on January 18, 2022. Mother testified, acknowledging her history of substance abuse and explaining the changes she had made and what she had learned in her rehabilitation program. She stated that she was not testing in the program but

14

was willing to do so if granted reunification. She also stated she would request the ability to attend 12-step meetings remotely while still in the program  Mother discussed her August relapse, stating that she felt guilty and immediately confessed, and had not had any further relapses. She visited with S every weekend and spoke with her by phone every other day. Mother testified that her relationship with S was "fun and beautiful" and talked about how they would play during visits. She also discussed her plan if the court granted reunification once she competed her program.

During argument, mother's counsel noted that mother voluntarily sought inpatient treatment and had been consistently participating for the past year. Mother continued to consistently visit S. and "fills that parental role in her daughter's life." He argued that mother "admits that she has a way to go before getting S[.] back in her care full time, but that's why she wants to start the reunification process now so that she can start testing, start looking for appropriate housing, and start having more consistent visits and overnights all while showing that she can handle the stressors of every day life without relapse."

S.'s counsel stated that when she saw mother's petition, she was "hopeful" that mother had finally turned things around. However, she asked the court to deny the petition, arguing that it was "really premature" given mother's long history of substance abuse and that mother had no negative test results supporting a change of circumstances. She noted mother's history of getting close to reunifying and "then something ends up happening," and pointed to mother's August relapse as a concern, particularly where it was triggered by "a disagreement with [maternal]

15

grandmother over what the child should wear to school." She noted that it was "very clear that there was a bond between this child and mother," but that mother had not "sufficiently addressed her substance abuse" to allow for reunification services at that time. Counsel for DCFS agreed with the arguments by S.'s counsel. She acknowledged that mother was "on the right path," but that it had taken her four years to enroll into the residential treatment program, and that it concerned DCFS that mother had recently relapsed over a "minor issue." DCFS also was concerned that mother was not currently testing or participating in Narcotics Anonymous, and that her "sobriety at this point is only self-reported." She also pointed out that mother had a warrant out for arrest from her DUI. She concluded that "circumstances are changing and not changed," and that the request was not in S.'s best interest, as the child was "stable in her current placement."

The court commended mother for her efforts, but told mother that she was "somewhat fragile, and you need to get to a place where you're stronger or you're able to repel these urges. But I don't see you as being there yet." The court found that the circumstances were changing, but not yet changed "to the extent where you're in a position to parent this child."

Turning to best interest, the court observed that S. had lived with mother for a small percentage of her life and that maternal grandmother's home "is the only home that she has a memory of." The court continued, "faith-based programs have their place, but they don't provide the source of services and feedback that courts need in order to support a change of circumstances. They don't provide testing there." The court

16

concluded that "the evidence before me does not support . . . approval of your petition to have reunification reinstated."  The court advised mother that although she was "not there yet," she could file another petition in the future.  The court therefore denied mother's petition.

Mother timely appealed.

## DISCUSSION

Mother contends that the juvenile court erred in denying her section 388 petition.  She argues that she established a change of circumstances justifying her request for reinstatement of reunification services.  She also argues that her bond with S. established that further services would be in S.'s best interest. We find no error.

### A.    *Legal Principles*

After establishing a guardianship, the juvenile court may dismiss its jurisdiction in recognition of the fact that the guardianship "is a permanent plan for the child and there is no need for ongoing scheduled court and social services supervision of the placement."  (*In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1216, citing §§ 11361, 11386, subd. (e).)  However, the juvenile court still maintains jurisdiction over the child as a ward of the legal guardianship and can vacate its order dismissing its dependency jurisdiction.  (*Ibid.*, citing §§ 366.3, subds. (a) & (b), 366.4.)

Further, "[a] parent has the continuing right to petition the [juvenile] court for a modification of any of its orders based upon changed circumstances or new evidence pursuant to section 388." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308–309.)  A parent may seek relief under section 388 even after the juvenile court has

17

terminated family reunification services.  "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests.  [Citation.]   Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order."   (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

To obtain modification of an order under section 388, the parent must demonstrate, by a preponderance of the evidence, both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child.   (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  In evaluating a section 388 petition, the juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner."  (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)  The analysis is a searching one; the court may consider the entire factual and procedural history of the case.  (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.)  "In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.'" (*Ibid*.)

"To support a section 388 petition, the change in circumstances must be substantial."  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)  Moreover, "[o]nce reunification services are ordered terminated, the focus shifts [from reunification] to the child's need for permanency and stability," and a

presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H., supra,* 5 Cal.4th at pp. 309–310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527.)

We review the juvenile court's denial of a section 388 petition for abuse of discretion. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081.)

**B.** *Analysis*

Mother acknowledges that she "had not been able to perfect her rehabilitation on her own," but contends that her participation in 10 months of a 12-month rehabilitation program, along with her commitment to therapy and to regular visitation with S., demonstrated sufficiently changed circumstances to justify her request for renewed reunification services. We find no abuse of discretion in the juvenile court's finding that mother had demonstrated changing, rather than changed, circumstances. At the time of her petition, mother had not yet completed her residential treatment program. Rather, her time in the program had been extended beyond the initial 12 months due to her recent relapse. She had previously failed to complete several outpatient programs while receiving 18 months of family reunification services, but nevertheless rejected the suggestions by DCFS and her program counselors that she enter a residential program. She had a substance abuse problem that had resisted treatment over several decades, and MGM described mother's longstanding pattern of periods of stability and sobriety followed by relapse. Notably, mother's recent relapse occurred during her treatment

19

program and while on a visit with S.  By mother's own admission, the relapse was triggered over a minor argument with MGM regarding clothing for S.  Moreover, although mother explained that she had not been drug testing or attending 12-step meetings due to the constraints of her program, the juvenile court was entitled to consider the lack of these external controls as evidence weighing against mother's petition.

"In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program."  (*In re N.F.* (2021) 68 Cal.App.5th 112, 121; see also, e.g., *In re C.J.W.*, *supra*, 157 Cal.App.4th at p 1081 [parents' most recent efforts at sobriety "were only three months old" and did not demonstrate changed circumstances]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [finding no changed circumstances where parent's "seven months of sobriety since his relapse in January, while commendable, was nothing new]; *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].)  Here, mother has not demonstrated that her ten months of rehabilitation, and only five months of sobriety, showed materially changed circumstances, particularly in light of her long history of substance abuse.

We also find that it was well within the juvenile court's discretion to conclude that mother's request for reinstatement of reunification services was not in S.'s best interest.  Mother cites her undisputed bond with S. and argues that it was in the child's best interest not to disrupt that bond.  While mother presented

evidence of her relationship with S., the court was also entitled to weigh S.'s interest in permanency and stability. At the time of the hearing on mother's petition, S. had lived out of mother's custody and with MGM for almost four years, since she was seven months old. She was well-bonded to and comfortable with MGM; as the court noted, MGM's home was likely the only home S. had ever known. MGM was committed to providing a permanent, stable home for S., and had the support of her other adult children.

Mother, on the other hand, had not yet shown any ability to offer stability to S., even after 18 months of reunification services and over a year after dependency jurisdiction was terminated. Where, as here, "'custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Mary G.* (2007) 151 Cal.App.4th 184, 204.) The court was not required to disrupt S.'s life at this late stage based on mother's belated claims here. (See *In re C.J.W.*, *supra*, 157 Cal.App.4th at p. 1081 ["there was no showing whatsoever of how the best interests of these young children would be served by depriving them of a permanent, stable home in exchange for an uncertain future"], citing *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) As such, mother has not met her burden to show the court abused its discretion in finding it would not be in S.'s best interest to grant mother additional reunification services.

## DISPOSITION

The order denying mother's section 388 petition and terminating her parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P.J.

We concur:



MORI, J.



ZUKIN, J.